■ In the Matter of THOMAS NEUFELD, Appellant, v JOSEPH J. PREVITE et al., Respondents.—Judgment, Supreme Court, New York County, entered March 31, 1976, affirmed, without costs and without disbursements. Petitioner, an uncommitted candidate for alternate delegate to the Democratic National Convention in the Democratic Party primary election to be held on April 6, 1976, seeks on his own behalf and on behalf of others similarly situated, to compel the Board of Elections of the City of New York (hereinafter "the Board") to comply literally with subdivision 7 of section 242-a of the Election Law. It is noted that this proceeding was initiated by order to show cause dated March 29, 1976 and in view of the circumstances hereinafter set forth, may be correctly described as "belated". Subdivision 7 of section 242-a of the Election Law provides: "7. Notwithstanding any provision of this chapter to the contrary, the following additional provision shall govern the use of voting machines for primary elections in New York City: The names of the candidates designated for each public office or party position in the primary of a party shall be placed under the title of the office or position in the alphabetical order of their surnames. If candidates surnames are identical, their given or first name and middle initial shall determine the order. In the first or lowest numbered assembly district and election district of any political unit or subdivision within a county and thereafter they shall be rotated by election districts by transposing the first named candidate to the bottom of the order of each succeeding election district, so that each name shall appear first and in each other position in an equal number, as nearly as possible, of the election districts and except, further, that where two or more candidates are to be elected to the same public office or party position, the names of candidates for such an office or position which appear on the same designating petition shall be grouped together on the ballot in the order in which their names appear on the designating petition and the group rotated alphabetically in relation to other groups or individual candidates according to the surname of the first person on the designating

petition of such group. * * * In cases where a name is added to or removed from the ballot by court order too late to make a complete adjustment to these requirements feasible, the name may be added at the bottom of the list of candidates in all election districts, or removed from the ballot in all election districts without changing the previously arranged orders of other names, without invalidating the election. Any inadvertent error in the order of names discovered too late to correct the order of the names on the ballots concerned shall not invalidate an election." Delegates and alternate delegates to the Democratic National Convention are elected by primary elections in Congressional Districts of which there are 16 within the City of New York and two additional districts partly in New York City and in an adjoining county. The delegate slates vying in the forthcoming primary may be viewed on a group basis as follows: the Udall, Jackson, Carter, Harris and the uncommitted slates. On March 11, 1976 (26 days prior to the primary election scheduled for April 6) the State Legislature passed a law setting up a new calendar insofar as presidential delegates and alternate delegates are concerned. In the original calendar promulgated by said Legislature, the last day to decline was February 24, 1976 and the last day to substitute was February 27, 1976. Under the new calendar, however, candidates were given a second opportunity to decline on or before March 17, 1976 and to substitute on March 18, 1976. The last day for presidential candidates to file authorizations for delegates to be listed as supporting them was March 20, 1976 (Saturday) so that they had until Monday, March 22, 1976. The passage of this new calendar imposed not only an apparent additional financial burden on the City of New York, but rendered the time schedule in view of the imminence of the primary election date, acute. On March 24, 1976, the Board had not received any certified list from the Secretary of State's office respecting the lists of delegates and alternate delegates as provided for in the new law. Faced with the demands of setting into motion the physical operations necessary to holding the primary election as scheduled, the Board telephoned the campaign headquarters of each presidential candidate and advised them that because of the delay, not occasioned by any fault on the Board's part, it would be unable to rotate the ballots with regard to the slates of delegates. The Board further declared that it would therefore be necessary to draw for position on the ballots and requested representatives of the presidential candidates to be present at 5:00 P.M. that day. This drawing was apparently accompanied by news coverage. On March 26, 1976, the Board finally received the certified list of the candidates from the Secretary of State. It is patent and not disputed that if the original calendar had not been changed so shortly prior to the scheduled election the rotation law would have been literally complied with. It further appears from the referee's report which was confirmed by Special Term that the drawing which was held resulted, insofar as the 16 Congressional Districts within the city are concerned, in uncommitted slates obtaining 25 of the top line and from 18% to 25% of the bottom line. Viewing this result pragmatically and with due regard for the salutary purpose underlying section 242-a of the Election Law, it must be concluded that the instant application was properly dismissed. Where literal compliance has been frustrated, not through any fault on the Board's part, and the Board seeks to accomplish the desired goal of the statute in a fair and impartial manner, pragmatic reality impels the conclusion that there has been substantial compliance. Indeed, subdivision 7 in its last paragraph inferentially demonstrates that the failure of literal compliance will not result in a void election, absent compelling circumstances. Petitioner has not demonstrated

such compelling circumstances on this record and at this time and the relief he seeks, if warranted, would of necessity require holding the primary on a date subsequent to April 6, 1976. Finally, the court notes that "Additionally weight should be given to the interpretation placed on the statute by the agency charged with responsibility for its administration" *(Matter of Hirschfeld v Feuer,* 35 NY2d 176, 178). In any event, appellant's slate is in the second of five places on the ballot in the district in which he is running. No one else is complaining. We do not consider that there is sufficient showing of any harm to appellant to warrant the relief he seeks, the granting of which would inevitably involve postponing the election at a very large cost. Concur—Lupiano, Birns, Silverman and Lane, JJ.; Murphy, J. P., dissents in the following memorandum: Murphy, J. P. (dissenting). I dissent and would reverse and direct the Board to comply with subdivision 7 of section 242-a of the Election Law. The board of elections never attempted to comply with the mandate of subdivision 7 of section 242-a of the Election Law. Instead, they unilaterally chose a method of placing the names on the ballot which would deny petitioner the very substantial benefits envisioned by the Legislature of eliminating preferential placement of candidates. Even the "draw" method as planned and effectuated by respondent failed to give any notice to petitioner of the fact that the statute would not be followed or that he had an opportunity to be present and participate in the "drawing". To condone respondent's procedure now on the grounds that there is not enough time to follow the Election Law is a denial of due process to petitioner and all those similarly situated, and to nullify this provision of the Election Law. In future elections the onerous task of properly rotating the names of candidates can be avoided by delay and then the argument that there is no time to comply. This section of the Election Law was never intended to make the conduct of elections within the discretionary ambit of the board of elections.